EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

Barbara Ehrlich White, Plaintiff-Intervenor,

and

Christiane L. Joost-Gaugier, Plaintiff-Intervenor,

v.

TUFTS INSTITUTION OF LEARNING, Defendant.

Civ. A. No. 73–2492–M.

United States District Court, D. Massachusetts.

July 3, 1975.

As Modified July 28, 1975.

154

Frank J. Tuk and Theodore Ravas, EEOC, Philadelphia, Pa., for EEOC.

Nancy Gertner, Boston, Mass., for intervenor White.

Jeanne Baker, Cambridge, Mass., for intervenor Joost-Gaugier.

Robert Glass, Nutter, McLennen & Fish, Boston, Mass., for defendant.

## MEMORANDUM

FRANK J. MURRAY, District Judge.

This is an action by Equal Employment Opportunity Commission (EEOC) against Tufts Institution of Learning (Tufts),[1] for relief from alleged discriminatory employment practices based upon sex in violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended by Pub.L. No. 92–261, 86 Stat. 103 (March 24, 1972), 42 U.S.C. § 2000e *et seq.*[2] EEOC seeks relief against Tufts to redress alleged discriminatory acts involving the discharges of Christiane L. Joost-Gaugier (Joost) and Barbara E. White (White), former employees of Tufts and teachers in the Fine Arts Department (sometimes referred to herein as Department), and other relief concerning employment practices and policies of Tufts.

Joost and White were permitted to intervene as plaintiffs, alleging Tufts had engaged in discriminatory employment practices against them, and each seeks injunctive relief to be reinstated in her employment with Tufts, and damages.

The case came on to be heard on the application of the plaintiffs for preliminary injunctive relief. Each party offered the testimony of witnesses and substantial documentary evidence.

### I

*EEOC* is a commission created under 42 U.S.C. § 2000e–4, and empowered under section 2000e–5 "to prevent any person from engaging in any unlawful employment practice as set forth in section 2000e–2 . . . ." EEOC is authorized to bring a civil action in this court under section 2000e–5(f)(1), and to apply for injunctive relief under section 2000e–5(f)(2), following the filing of a charge with EEOC on behalf of a person claiming to be aggrieved alleging that an employer has engaged in an unlawful employment practice.[3]

*Joost* is a female residing in Newton, Massachusetts. She was graduated from Radcliffe College with a B.A. Degree in 1955, and in 1959 received her M.A. Degree from Radcliffe and Harvard University. She was first employed by Tufts as a part-time Lecturer in 1967 in the Fine Arts Department, and served in that position for two years; and during that period she was also part-time Lecturer at Newton College of the Sacred Heart. In 1969 she was employed full time by Tufts in the Department with the rank of Assistant Professor. Her teaching experience began at Michigan State University where she was employed full time in 1961–62 as a teacher of fine arts and art history. Tufts notified her on August 21, 1972 that her contract of employment would not be renewed at the expiration of the 1972–73 academic year.

---

1. Defendant asserts the proper name is Trustees of Tufts College. See Chapter 141 of the Massachusetts Acts and Resolves of 1852.

2. In pertinent part section 2000e–2 provides:
   (a) It shall be an unlawful employment practice for an employer—
   (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . . .

Section 2000e–3 in pertinent part provides:
   (a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . . .

3. Defendant has raised no question as to the authorization of the institution of the action by EEOC, or the intervention by Joost and White.

*White* is a female residing in Lexington, Massachusetts. She received her A.B. Degree from Smith College in 1958, a M.A. Degree from Columbia University in 1960, and her Ph.D. in art history from Columbia in 1965. She was first employed by Tufts in 1965 with the rank of Lecturer teaching art history, and employed as Assistant Professor in the Department during the academic years beginning September 1966 to August 1973. In January 1972 White was informed that the tenure committee had decided not to recommend her for promotion to the rank of Associate Professor and for tenure. She was notified by Tufts on May 4, 1972 that her contract of employment would not be renewed at the expiration of the 1972–73 academic year.

*Tufts* is a private, non-profit, educational institution of higher learning situated in Medford, Massachusetts. The chief administrative officer is its president, *Burton Hallowell*. The academic functions of Tufts are immediately supervised and directed by its Provost (*Katherine McCarthy,* formerly Dean of the Graduate School, appointed Provost June 15, 1973) and the Deans of the four principal schools of the University.[4] The chain of academic authority to the Fine Arts Department descends from the President to the Provost to the Dean of the Faculty of Arts and Sciences (*Bernard Harleston* from September 1970) to the Dean of the College of Liberal Arts (*Dean Mumford*).

*Ivan Galantic* (Galantic) was employed as a tenured member of the Fine Arts Department in January 1971 with the rank of Associate Professor, and named Chairman of the Department. He is the first tenured member of the Department. Throughout the events involved in this proceeding Galantic was the only tenured faculty member in the Department. He served as Chairman until July 9, 1972, when he was forced to step down from that position by Dean Harleston, but he remained as Associate Professor. When Galantic was hired, he,

Joost and White comprised the full-time members of the Department.

## II

In seeking injunctive relief against Tufts to reinstate Joost and White, plaintiff and intervenors have raised and sought to substantiate by testimony and documentary evidence the following claims:

(a) That Joost was discriminated against by Tufts based on her sex (1) in the compensation paid her as salary, in that larger salaries were paid men in the Department, and paid men holding the rank of Assistant Professor in the University; (2) in other terms and conditions of her employment, in that (i) she was denied secretarial help that men in the Department received, (ii) she was not consulted by Galantic on dispensation of scholarships or graduate admissions of students to the Department or on the Department's Masters program, (iii) Galantic held no meetings of the faculty, (iv) she was subjected to a working environment heavily polluted with sex bias; (3) in that she was harassed and intimidated; and (4) in that she was discharged in retaliation for her public opposition to the discriminatory conditions of her employment.

(b) That White was discriminated against by Tufts based on her sex (1) in the compensation paid her as salary, in that she was treated differently from men in the Department and elsewhere in the University; (2) in other terms and conditions of her employment, in that (i) Galantic treated her differently from men in the assignments of Department duties and privileges, and concerning dispensation of scholarships and graduate admissions to the Department, (ii) Galantic refused to order additional Renoir slides for White's seminar in 1971, refused to assign a student helper to White's courses, attempted to obstruct White's efforts to schedule a lecture by a noted French scholar, (iii) Galantic bullied and belittled her, (iv) Galantic held no meetings of the faculty, (v) she was denied secretari-

---

**4.** Since the Fine Arts Department is included within the School of Arts and Sciences, this memorandum will not be concerned with the other schools except as it is necessary to deal with the claims made by plaintiffs.

al help that men in the Department received; and (3) in the denial of tenure and promotion to the rank of Associate Professor.

## III

A preliminary injunction will issue only upon a demonstration that the plaintiff will probably prevail on the merits of the complaint and that, absent the preliminary injunctive relief, the plaintiff will suffer irreparable injury. *Automatic Radio Mfg. Co. v. Ford Motor Co.,* 390 F.2d 113 (1st Cir. 1968), *cert. denied,* 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968).

In considering the propriety of preliminary injunctive relief in a case charging employment discrimination on the grounds of sex, the court's attention must be initially directed toward the underlying purposes of the Equal Employment Opportunity Act, as amended. It is important to note at the outset what was said in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971):

> Congress did not intend by Title VII . . . to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.

*Id.* at 430–31, 91 S.Ct. at 853. Until March 24, 1972, Title VII exempted educational institutions with respect to teachers, but the exemption was lifted by Pub.L. No. 92–261, § 3, which amended 42 U.S.C. § 2000e–1. The amended Act is prospective in application and provides no remedy for a person merely because he was formerly the subject of discrimination. But the Act should be construed to apply to discriminatory discharges taking place after the amendment became effective though the decisions concerning the discharges were made before March 24, 1972.

In the legislative history of the amendment it is stated in H.R. No. 92–238 that when women "have been hired into educational institutions, particularly in institutions of higher education, [they] have been relegated to positions of lesser standing than their male counterparts. In a study . . . it was found that the primary factors determining the hiring of male faculty members were prestige and compatibility, but that women were generally considered to be outside of the prestige system altogether". (Footnote omitted.) U.S.Code Cong. & Admin.News, p. 2155 (1972). As amended, the Act clearly proscribes discriminatory preference on the basis of sex in institutions of higher learning in their hiring, compensation, promotion and termination practices with respect to faculty members. Thus the plain intendment of the Act is that if an employment practice which operates to exclude women faculty members from promotion cannot be shown to be related to applicable standards for academic advancement, the practice is prohibited. *Compare Griggs v. Duke Power Co., supra* at 431, 91 S.Ct. 849. The relationship between a university and a faculty member, whether a male or female, however, cannot be viewed as the typical employer-employee relation found in industry or commerce. This follows from the roles that faculty members and faculty committees have in exercising influence in varying amounts over educational policy and service to the university and to the student body. "This relationship is said to stand in contrast to the normal adversarial positions of employees and monolithic management . . . ." *NLRB v. Wentworth Institute,* 515 F.2d 550 (1st Cir. 1975). Thus a proper perspective of the underlying purpose of the Act, as amended, when applied to a claim of sex bias, must have regard to the nature and character of the employment relationship between a university and a fac-

ulty member generally, and in the particular institution involved.

■ Evaluations of a faculty member's eligibility for promotion in teaching rank or for tenure necessarily involve exercise of the judgments of several persons. In applying the criteria for academic advancement, the weighing of the factors properly to be considered can seldom, if ever, be reduced to measurements by mechanical processes or standardized tests. In the absence of specific standards in the Act or under the regulations, the criteria and procedures established by a university for promotion and reappointment of faculty members are controlling. Thus where the criteria are reasonably related to the professional duties of the academic position sought and to the personal qualifications of the applicant, and are applied through prescribed or settled procedures fairly and reasonably followed, the court should not substitute its judgment for that of the university authorities. The focus on criteria and procedures must be on those of the particular university involved. In the absence of proof of discriminatory application on the grounds of sex of the institution's established nondiscriminatory standards, an adverse decision on an application by a woman for reappointment or academic advancement is not to be found the "artificial, arbitrary and unnecessary barrier to employment" which Congress intended to remove. *Griggs v. Duke Power Co., supra,* 401 U.S. at 431, 91 S.Ct. 849. It is quite another matter, however, if proof of actual sex discrimination is shown, or if the adverse decision is shown to have no rational basis except sex bias to support it.

■ In a Title VII case alleging racial discrimination, *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Court formulated the showing required to establish a prima facie case and carefully pointed out that the formulation[5] will not necessarily be applicable to other Title VII cases.[6] A prima facie showing of sex discrimination is not demonstrated by proof that a female faculty member is within a class protected by Title VII, has sought and was denied academic reappointment or advancement, and was later discharged. If it were otherwise, the jurisdiction of the federal courts would be invoked to review and supervise practically all university decisions adverse to women applicants for promotion or reappointment. Despite the language in the legislative history of the 1972 amendment already referred to, the underlying purposes of the Act do not give support to any such broad and penetrating federal court analysis.

■ It must be recognized that actual sex discrimination in university employment practices may not always be readily discerned. Statistical data will sometimes furnish evidence of disparate treatment of the sexes. *See Johnson v. University of Pittsburgh,* 359 F.Supp. 1002 (W.D.Pa.1973). But statistics can be misleading, and a critical analysis of the data will ordinarily be required. Seldom will mechanical application of statistics furnish a basis for a prima facie showing of sex-biased judgments in the decision-making process of faculty promotions and reappointments. Unless the statistics can be properly said to speak for themselves by showing a clear imbalance favoring one sex over the other in the decisions themselves, a plaintiff's burden of establishing a prima facie case of discrimination must be met by other more significant evidence.

---

5. "The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." (Footnote omitted.)
*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817 at 1824, 36 L.Ed.2d 668 (1973).

6. *Id.* at 802 n., 13, 93 S.Ct. 1817.

## IV

### a. *The factual showing*

The intervenors' claims for injunctive relief stem mainly from Galantic's operation of the Department while he was Chairman, and from what it is claimed he said and did during the time he was Chairman and afterwards. Joost and White knew very little of Galantic before he became a member of the Department and Chairman in January 1971, but it was only a short time afterwards that the professional and personal relations between them began to deteriorate. Galantic arrogated to himself almost full control over the activities of the Department, and denied to Joost and White, the only other full-time members, any significant sharing in the administration of its activities and affairs. His manner was abrupt, sarcastic and arbitrary, and throughout his term as Chairman every member, male and female, experienced unhappy occasions in their contacts with him. Complaints were made to Harleston, Dean of the Faculty of Arts and Sciences, concerning Galantic, initially by Joost and later by White and the male members of the Department. Galantic was aware that complaints had been made. He resented the criticism of his handling of the Department and its affairs, looked upon the complainants as traitors, and denounced Joost and White as well as the others for failing to support him as Chairman. Galantic's displeasure with Joost and White became known to them, to some of the students in the Department, to certain faculty committees and to Harleston. In early 1972 Harleston requested members of the Committee on Faculty Personnel Policy to investigate the complaints that had been made to him concerning Galantic and the operations of the Department. In the Summer of 1972 Harleston concluded from his own investigation of the complaints and from reports received from Dean Mumford and members of the Faculty Personnel Policy committee that the internal conflicts in the Department, in which he found that all faculty members were involved, adversely affected the quality of teaching and scholarship and bred distrust and insecurity on the part of the faculty members, and that Galantic was unsuited to administer effectively the Department. Harleston then requested Galantic's resignation.

### b. *The showing as to Joost*

Joost was employed full time without tenure by Tufts at a salary of $8,500 with the rank of Assistant Professor under a one-year contract. In the Spring of 1970 she was given a three-year contract, the term to commence with the academic year 1970–71 and ended with the academic year 1972–73. Her salary for the first year of the new contract was $9,500, for the second year $10,100, and for the last year $10,500.[7] Professor Russell Smith was Chairman of the Department when Joost was given these contracts. In 1970 she was working toward her Ph.D., and she and Smith discussed what the future might hold for her at the end of the three-year contract. Smith told her that "unless anything goes wrong" she might look forward to another three-year contract.

Prior to September 1, 1972 the decision was required to be made, in accordance with the provisions of the Faculty Handbook and with Tufts' practice, whether Joost would be tendered a three-year reappointment at the termination of the existing three-year contract. Joost was aware of these requirements. In the early part of the Spring, 1972, Harleston had advised her

7. The average annual salaries of men and women of the Faculty of Arts and Sciences for Assistant Professor were as follows:

| | Men | Women | Difference |
|---|---|---|---|
| 1971–72 | $ 11,365 | $ 10,940 | $ 425 |
| 1972–73 | 11,976 | 11,044 | 932 |
| 1973–74 | 12,677 | 11,995 | 682 |

The median annual salaries of men and women of the Faculty of the College of Liberal Arts for Assistant Professor were as follows:

| | Men | Women | Difference |
|---|---|---|---|
| 1971–72 | $ 11,200 | $ 10,750 | $ 450 |
| 1972–73 | 11,750 | 11,000 | 750 |
| 1973–74 | 12,400 | 11,900 | 500 |

that there would be no promotion without a completed Ph.D. thesis. Authority to make reappointments of non-tenured faculty members was vested in the Dean of the Faculty of Arts and Sciences in consultation with the Provost. Throughout 1972 Harleston was Dean, and Professor Ulman was the Provost. Harleston made the decision not to reappoint Joost after considering student evaluations and consultation with Ulman, Galantic, Dean Mumford and Dr. Zarker.

The criteria for tenure and promotion, which is the goal of reappointment, refer to the candidate's qualifications as evidenced by quality of mind, intellectual force, scholarship, teaching effectiveness, and contributions to departmental objectives and those of the whole University. As to these criteria, the expectation is that a candidate will not be inferior in any one of them.

In reaching the decision in the Summer of 1972 not to reappoint Joost, Harleston considered that Joost had not demonstrated development of adequate scholarship; that the rate of progress toward the Ph.D. had been very slow; that the time interval since her Bachelor's Degree in 1955 militated against favorable predictions concerning her future performance; and that her appointment at the professor level (assistant professor) in 1969 without the Ph.D. was unusual; that she was a popular teacher with the students and her lectures were well organized and presented; that the conflicts in the Department after Galantic was appointed Chairman, in which Joost was involved, created serious instability in the Department; that the conflicts demonstrated lack of maturity in Joost, and others, and raised important questions whether she would develop as a scholar and teacher; that the Department needed to be upgraded and strengthened; and that Tufts could and should make a stronger and better appointment than Joost.

Before making the decision not to reappoint Joost, Harleston consulted with Provost Ulman, who gave support to the decision. Galantic recommended that Joost not be reappointed. Dr. Zarker, who was acting Chairman of the Department after Galantic resigned, recommended that Joost not be reappointed. Dean Mumford reported his conversations with Joost as to the slow progress of her thesis, and also advised of the instability in the Department arising out of the conflicts among the faculty members. Harleston concluded from his own investigation and from the reports received from Mumford and members of the Committee on Faculty Personnel Policy that certain complaints by Joost, including the so-called Nancy Webb accusation against Galantic, could not be substantiated, and that in some respects both Joost and Galantic lacked credibility and were not always reliable.

When Harleston forced Galantic's resignation on July 9, 1972, the decision not to reappoint Joost had not been determined. Galantic's recommendation that Joost be not appointed carried substantial weight, because he had been Chairman. Harleston knew of the conflicts between Galantic and Joost, but he also was aware of the conflicts Galantic had had with every member of the Department, male as well as female. He knew that Galantic had exhibited a dictatorial manner on occasions toward Joost and White, and that Galantic had been accused of deprecating the role of women in graduate school in conversations with female students. Harleston considered that Galantic might possibly be biased against Joost because she was a woman, but thought it unlikely because of Galantic's support of other women for faculty positions in the Department.

At the hearing before the court Harleston disclaimed entertaining any sex bias against Joost in reaching the decision not to reappoint her. As Dean of the Faculty of Arts and Sciences, he had denied reappointment to other non-tenured faculty members. The statistics reflecting his denials are instructive. Of a total of 101 male

non-tenured faculty applicants (59 assistant professors and 42 instructors) he denied reappointment to 12; of 43 female non-tenured faculty (16 assistant professors and 27 instructors) he denied reappointment to 6.[8] Also as Dean he had recommended that 4 males be not granted tenure who had been approved for tenure by the Faculty Committee. He had never recommended that a female approved by the Faculty Committee be not granted tenure.

When Joost received notice that she would not be reappointed as assistant professor, she met with Harleston seeking the reasons for the denial of reappointment. She testified that Harleston never gave her his reasons. Harleston testified that he did. Further, Joost testified that Provost Ulman told her that he did not know the reasons why she was not reappointed. Ulman was not called as a witness by any party. Harleston testified that in early 1972 he asked Joost for an up-to-date resume. In her testimony she never denied the request was made; her testimony was that she did not remember being asked for it. She did agree that she never furnished Harleston her resume. Harleston further testified that he never had opportunity to examine Joost's thesis before his decision was reached not to reappoint her. It was Joost's testimony that in the Spring of 1972 she saw both Harleston and Mumford with her thesis, and that "they ignored it". The court had difficulty in finding Joost's testimony reliable in these matters. In the first place Harleston and Ulman knew that Joost had made charges against Galantic of sex discrimination in April 1972, some three or four months before Harleston decided against Joost's reappointment. They must have considered that she would file similar charges against Harleston should he arbitrarily decline to give the reasons for his decision. While it was Tufts' policy not to publicly disclose the grounds of decision, there were no proscriptions against giving the applicant the reasons why the decision was adverse to her. On balance Harleston had nothing to lose by disclosing the reasons to Joost; he had much to lose by refusing her request. Furthermore Joost's behavior after receiving notice that she would not be reappointed is inconsistent with her claimed lack of information of the reasons for the decision, particularly as they related to the slow rate of progress of her thesis. As Professor Ackerman pointed out in his testimony, it was not until the Summer of 1972 that the main increase in Joost's productive work toward the Ph.D. occurred. The court finds she was informed of the basic reasons for Harleston's decision and that her testimony to the contrary is not reliable. The court also finds from Professor Ackerman's description of the doubtful quality of her thesis in the Spring of 1972, and the slow rate of her work on it, that it is not likely she would have exhibited it to either Harleston or Mumford at that time. It is also improbable she would have forgotten whether Harleston asked her for her resume. Her testimony that she brought her thesis to Harleston is unreliable.

Joost remained at Tufts teaching in the Department after Harleston's decision was made denying her reappointment. She was awarded the Ph.D. in June 1973. Harleston did not accede to her request for a modified reappointment of one year. Her contract of employment terminated in August 1973.

### c. *The showing as to White*

White was given a three-year contract at Tufts without tenure with the rank of Assistant Professor in 1968. After talking then with Dean Knapp (?Knipp), who was not otherwise identified, she expected she would get tenure early. She took a leave of absence during the 1969–70 academic year to carry on research in her field of scholarship aided by two grants which she re-

---

**8.** Joost is included in the six females denied reappointment. Excluding Joost from these statistics, the percentages on denials show a remarkable even-handedness of treatment of the sexes, i. e., denial of males 12/101 equivalent to 11.8 percent, and of females 5/42 equivalent to 11.9 percent.

ceived. Some time after her leave had commenced she requested that the 1969–70 academic year be not counted within the seven-year probationary period, and that request was denied by Harleston. She resumed her teaching in the Department after the leave of absence expired. In the 1971–72 academic year the decision had to be made by the Committee on Tenure and Promotion (Tenure Committee) whether she would be granted tenure. White knew of this requirement and seasonably applied to the Tenure Committee for tenure and promotion. In accordance with Tufts' by-laws the Tenure Committee undertook to create a subcommittee to review White's application, and addressed a letter to White requesting that she submit the names of tenured members of the Tufts' faculty who would be acceptable to her as subcommittee members. She submitted ten names to the Tenure Committee, five of whom were members of Tufts' faculty. As announced, the subcommittee was comprised of two members of the Tenure Committee (Professors Burnim and Simches), two members nominated by White (Professors Balmuth and Deknatel), and Professor Galantic, the only tenured member of the Fine Arts Department. Professor Deknatel was a tenured faculty member of Harvard University; the others were tenured faculty members of Tufts.

Before the subcommittee met to consider her application, White saw Professor Stearns, Chairman of the Tenure Committee, and also Harleston, and requested that Galantic be replaced by another. As grounds for her request she asserted that Galantic was known to be opposed to her tenure, and she attributed his opposition as stemming from bias against her as a woman. Harleston knew of specific accusations referring to sex bias made against Galantic by students in the Department. He had heard from Dean Mumford that Galantic had an Old World concept of woman's place in a university. He was also aware of the

accusation that Galantic had solicited letters against White in her quest for tenure. Harleston had questioned Galantic about the anti-female statements attributed to him by the students, and after receiving Galantic's denials Harleston did not further pursue the matter.[9] Both Harleston and Stearns were aware of numerous complaints against Galantic as to his attitude toward women in general that had been made to several of the deans, and knew of the contents of the galleys referring to Galantic's anti-female attitude of a proposed article in the *Criterion,* the Tufts' newspaper. Stearns and Harleston each denied White's request that Galantic be replaced on the subcommittee by another. Approximately two months later the subcommittee unanimously voted not to recommend White for promotion or tenure.

White's contract with Tufts terminated in August 1973, and she received no salary from Tufts after March 14, 1974. She has not been employed since, although she has sought employment in universities in and around Boston.

V

a. *Joost's application for injunctive relief*

■ The plaintiff EEOC and Joost have failed to make out a prima facie case of unlawful sex discrimination as the cause of Tufts' termination of Joost's employment as a teacher in violation of 42 U.S.C. § 2000e–2(a)(1), or for Joost opposing Tufts' employment practices, or because she made a charge in an investigation of Tufts' employment practices, in violation of section 2000e–3(a). They have not demonstrated that there is a likelihood of success on the merits of their complaints of establishing that the cause of Tufts terminating her employment was related to sex bias in violation of Title VII.

The disparity in salaries paid men and women which was demonstrated—and not

---

9. Although Harleston forced Galantic's resignation some six months after White was denied tenure by the subcommittee, he was motivated

in part to have Galantic step down by reports he had received of Galantic's attitude toward and treatment of women students.

satisfactorily explained by defendant—while arguably evidence of discrimination in that aspect of employment, cannot, upon the showing made on the application for injunctive relief, be found to demonstrate sex discrimination in the decision to terminate Joost's employment.

The evidence is not in dispute that the decision that Joost be not reappointed was made by Harleston in consultation with Ulman, the Provost. Galantic did not make the decision, and participated in the process only in making a recommendation against her reappointment. Before the decision was made Harleston was aware of the evidence tending to show Galantic's sex bias toward women in university employment, but there was no showing whatsoever that Harleston was influenced in his decision by any sex bias toward Joost. There was evidence of a basis in fact for his decision not to reappoint Joost, when the criteria for reappointment are considered. The reliable evidence, including the statistics of his record in prior reappointment decisions, tended to support the decision as having been made without sex bias as an influencing factor. There was no persuasive evidence to the contrary. There was no believable evidence, as argued by Joost in her post-hearing memorandum, that Harleston and Galantic struck a bargain, that is, that Galantic would resign as a *quid pro quo* for Harleston eliminating Joost from the Department.

Harleston took appropriate steps to resolve the question of the contradictory statements of Joost and Galantic on Joost's complaints, and found their statements both wanting in believability. He waited until August for evidence of Joost's serious attitude in her progress toward the Ph.D. Admittedly, there was no deadline set on the thesis, but Harleston was entitled to consider whether there was a genuine demonstration of a scholar's attitude in the productive work of the candidate for the Ph.D. Joost's explanation of the burden she claimed she was obligated to carry in the Department as it militated against her

opportunity to produce her thesis earlier, was not convincing.

Joost makes much of Galantic's autocratic control of the administration of the Department. While it was a source of frustration to her, and spurred her to make complaints against Galantic, it had no sex bias effect on Harleston's decision. Harleston had nothing to do with Galantic's appointment to the Department as a tenured member or as Chairman. When he concluded that Galantic was a poor administrator he forced Galantic to resign. This step was the first taken by him to upgrade the Department. Harleston also concluded that Joost's performance as a scholar left much to be desired in the process of strengthening the Department, and that Tufts could and should make a better and stronger appointment. As Dean of the Faculty of Arts and Sciences he was entitled to make that judgment, and Tufts could execute it as long as it was not based on sex discrimination.

The court should not and will not inquire into the respective qualifications of Galantic and Joost as scholars. This is a not a case, upon the showing made by the evidence, of a decision that has no rational basis except sex bias to support it. A prima facie case of violation of Title VII has not been demonstrated.

b. *White's application for injunctive relief*

▆ The plaintiff and White have sustained the burden of making out a prima facie case of unlawful discrimination. It has been shown that the procedure invoked by Tufts to review White's application for promotion and tenure from its inception became suspect as to its freedom from sex bias influence, and its fairness, by inclusion of Galantic on the subcommittee. It has also been shown that there was evidence before the subcommittee of White's qualifications for promotion and on that evidence the subcommittee could have reached a decision favorable to White. Since White was a member of a class protected by Title VII, it was not required that she show more

than the suspect character of the subcommittee and evidence pending before that committee of her qualifications for promotion to make out a prima facie case.

■ It is clear that Title VII permits no subtle discrimination on the basis of sex in university promotion and tenure practices. The evidence was overwhelming that Galantic had opposed White's tenure before the subcommittee was appointed. His reputation for bias against women in the field of fine arts was known to the Tufts' administrative officials. That reputation had been established by numerous complaints that reached upward to the highest level of academic authority. Specific instances of his remarks and statements tending to show his sex bias had been presented to the Dean of the Faculty of Arts and Sciences, Dean Harleston. That Galantic was only one of five members did not alter the suspect character of the subcommittee. Rather, his position as Chairman and the sole tenured member of the Fine Arts Department would serve to accentuate his influence in the committee's deliberations. No affirmative action was taken by the administration to have him replaced on the subcommittee in the face of his expressed opposition to White's tenure and his reputation for sex bias. In order to satisfy the underlying purposes of Title VII, and to remove unnecessary barriers to promotion "when the barriers operate invidiously to discriminate", White was entitled to be judged by a subcommittee that was free from the influence of sex bias.

There was evidence before the subcommittee that White was qualified for promotion, and evidence that she was not. It is not for the court to evaluate White's qualifications for promotion. That must be done by her academic colleagues. In making out a prima facie case here, however, it is sufficient for the plaintiff to establish that the subcommittee on the evidence before it could have reached a decision favorable to White. This the plaintiff has done. The burden then must shift to the defendant to show some nondiscriminatory reason why White was denied promotion.

■ Galantic was not called as a witness to deny or explain the accusations made against him of sex bias. All of the other members of the subcommittee, except Professor Deknatel who had died, were available to be called to explain the degree and nature of the influence, if any, exerted by Galantic in their deliberations. None was called. Although the members of the subcommittee were unanimously opposed to White's tenure in the subcommittee's written decision, Professor Balmuth's position is expressed somewhat equivocally. The decision discusses in detail aspects of White's scholarship and intellectual quality, her teaching and her service to the Department and University, and it is clearly apparent that Galantic's views were considered and carried weight with the members. Although the decision appears fair on its face and free from the influence of sex bias, and thus suffices to meet the prima facie case, White is entitled to show at a hearing on the merits that what appear to be valid reasons for denying her tenure were in fact colored by the influence of sex bias.

■ Statistics were offered to show that Tufts has hired and retained in its employ proportionately more women than men in consideration of the available male and female potential candidates for faculty positions, and has granted tenure to a higher percentage of females than males. These statistics may be helpful to a determination that defendant's denial of tenure to White did not conform to a general pattern of Tufts' treatment of women faculty members seeking tenure. But the thrust of plaintiff's case is that the individualized decision related to White was produced by the sex bias exerted on the subcommittee members by Galantic, and the plaintiff is entitled to the opportunity to show that such was the case at the hearing on the merits. Thus the statistics do not meet completely the prima facie showing.

■ It is not disputed that the replacements of both Joost and White in the Department were women. While facially such fact would seem to be a valid answer

to a claim of sex discrimination, it will not prevail at this stage where plaintiff has made a prima facie showing. Title VII can be violated if discrimination with respect to terminating employment on the grounds of sex is proved, notwithstanding that a person of the same sex is the replacement. The plaintiff is entitled to have the opportunity to show at the hearing on the merits that the appointment of the replacement was made to conceal or cover up a discriminatory decision.

For the reasons stated, the court finds that there is a reasonable likelihood of plaintiff prevailing on the merits of the complaint by showing that Galantic intentionally engaged in a course of action to defeat White's tenure because she was a woman, and sought to influence the subcommittee to produce the decision denying her tenure.

Turning to the issue of irreparable harm, it is shown that White has the Ph.D. Degree in the field of art history. She is now 38 years of age, married, and the mother of two minor children. She has a good professional reputation. At her stage in life positions are rather difficult to obtain; the preference for faculty members in her field seems to run to younger candidates. This is not the case of the ordinary salaried employee who has been discharged wrongfully, and where damages would be an adequate remedy. Her ability to secure a faculty position has been and will be harmed because of the decision denying her tenure. There is little doubt that her reputation also has been impaired by reason of the decision. Any prospect for a position at the administrative level in a university seems foreclosed to her where she is not presently employed. These factors satisfy the court that the harm and injury to White from the decision denying her tenure will be irreparable.

Balancing the equities in the case, there is greater harm that will be suffered by White should injunctive relief be denied her than will be experienced by Tufts if injunctive relief is granted. To be sure there will be the need of adjustment by Tufts with attendant inconvenience, but this is indeed outweighed by the harm and injury to White. Moreover, it is in the public interest that injunctive relief be granted here. Pending final determination of the case on the merits the status quo concerning White should be preserved.

Accordingly, the motion for preliminary injunctive relief to reinstate Joost is denied; the motion for injunctive relief on behalf of White is granted.