662 F.2d 320
 27 Fair Empl.Prac.Cas. 440,
27 Empl. Prac. Dec. P 32,248, 1 Ed. Law Rep. 60
 Charles JAMERSON, Plaintiff-Appellant,
v.
The BOARD OF TRUSTEES OF the UNIVERSITY OF ALABAMA, a
corporation a/k/a the Board of Trustees of the
University of Alabama in Birmingham,
Alabama, a corporation,
Defendant-Appellee.
 No. 79-3020.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B*
 Nov. 23, 1981.
 George M. Maurer, Jr., Detroit, Mich., for plaintiff-appellant.
 Ina B. Leonard, Birmingham, Ala., for defendant-appellee.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before KRAVITCH and THOMAS A. CLARK, Circuit Judges, and LYNNE**, District Judge.
 THOMAS A. CLARK, Circuit Judge:
 
 
 1
 Appellant attacks the district court's dismissal of his Title VII action against the University of Alabama at Birmingham. Contrary to the appellant's claim, the court found that the defendant-appellee did not discriminate against Mr. Jamerson because of his race. Appellant questions his hiring as an assistant professor without tenure in 1973 as well as his release three years later. Appellant also seeks reversal of the district court's refusal to certify him as a class representative for all black applicants for academic positions with the University as well as all blacks denied tenure. We have reviewed the testimony and the exhibits and affirm the district court.
 
 
 2
 In 1972 officials at the University of Alabama at Birmingham (UAB) established the Center for Labor Education and Research (CLEAR) for the purpose of conducting nontraditional training of workers in the State of Alabama concerning unions, union organization, collective bargaining, procedures surrounding processing of grievances, and responsibilities of union stewards and officials. At that time there were approximately 30 such programs at colleges and universities in the United States, but this was the first such program initiated at an institution for higher learning in the Southeast. Higdon C. Roberts, Jr. was employed as director of the Center. He had a bachelor's degree in economics and two master's degrees one in education, administration, and history, and the other in political science, and a doctorate in political science. By availing himself of after-hours educational opportunities, Dr. Roberts obtained a formal education while gaining "real world" practical labor experience. As a teenager Dr. Roberts worked as an apprentice baker and a member of the Bakery and Confectioners Workers Union in his home town of Cincinnati. Later he was a warehouseman and a member of the Teamsters Union. He was a labor union organizer in eastern Ohio and western Kentucky and later worked for a railroad and was a member of the Brotherhood of Railroad Trainmen for approximately ten years. He then started his teaching career at the University of Indiana and was active in the American Federation of Teachers, and he was an organizer for AFT in Illinois and Ohio. Before coming to the University of Alabama in Birmingham in 1972, he had taught two years at Ohio State University and five years at Indiana University in areas identical to those prescribed for the CLEAR program at the University of Alabama at Birmingham.
 
 
 3
 To establish a solid core for the program, Dr. Roberts employed Dr. Douglas W. Davis, Jr. and James W. Goode as Associate Professors with starting salaries of $17,000 per annum. Plaintiff/appellant Jamerson was employed one year later at the beginning of the 1973 academic year as an Assistant Professor without tenure at an annual salary of $18,000. Several months after commencing his teaching career at the University of Alabama at Birmingham, Jamerson learned that his colleagues Davis and Goode had tenure.
 
 
 4
 The first issue in this lawsuit is whether Jamerson's claim of racial discrimination in employment is meritorious. His claim is based upon the fact that he is black and Davis and Goode are white and upon allegations that his qualifications to teach on the faculty were clearly superior to those of Davis and Goode and thus the only logical reason for the distinction in their positions at time of employment is Jamerson's race. Because appellant failed to prove the superiority of his qualifications, his discrimination-in-employment claim is without merit.
 
 
 5
 Jamerson's employment was for two years with the option of the University to renew it. At the end of the two years, Jamerson was advised that his contract would not be renewed but his employment was extended one year, which is the custom at the University. Thus, the second issue is whether Jamerson's contract at the University was not renewed because of race or, alternatively, because of retaliation as a result of Jamerson's commencement of grievance proceedings with respect to his initial hiring. The ample evidence of appellant's poor performance supports the district court's conclusion that he was discharged for nonracial reasons.
 
 
 6
 The third issue is whether the district court should have certified Jamerson as a class representative for other possible discriminatees on the basis of race at the University. If the district court properly found no discrimination, any nexus between appellant and any class of alleged injured persons would be weakened. For that reason, we will address the class certification issue last.
 
 
 7
 A plaintiff must establish four factors under Title VII, 42 U.S.C. § 2000e-2, et seq., in order to make a prima facie case of discrimination in hiring:
 
 
 8
 (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applications; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).
 
 
 9
 The McDonnell factors are not directly applicable to this fact situation. As the Supreme Court has indicated, the standard is flexible. Id. at 803 n.13, 93 S.Ct. at 1824 n.13.
 
 I.
 
 10
 On these facts then Jamerson must establish that because he is black, his appointment was as an Assistant Professor without tenure rather than an Associate Professor with tenure. Appellant's burden was further complicated since he was hired at a different time than the other CLEAR professors. Only one position was advertised as open and appellant was hired to fill it. The core of appellant's claim requires proof that he was at least as qualified as the white teachers, Goode and Davis. Without this proof, Jamerson's claim collapses.
 
 
 11
 The Supreme Court most recently addressed the burden of proof in Title VII cases in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). "The prima facie case serves an important function in the litigation: it eliminates the most common non-discriminatory reasons for the plaintiff's rejection." Id. at 1094. Here it is unlikely that plaintiff met even this light burden either as to his initial hiring or his non-retention. Unquestionably, the University established its burden "by producing evidence that plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason." Id. As to the hiring, plaintiff was less qualified; as to the non-retention, plaintiff failed to adequately perform.
 
 
 12
 Dr. Douglas Davis was 45 years of age at the time of employment and had received his bachelor of science and master of arts degrees as well as his PhD degree in speech and communications. Dr. Roberts had taught with Dr. Davis at Indiana University in Indiana's center for labor education and knew firsthand of Dr. Davis' ability and experience in teaching labor unionism as envisioned in the CLEAR program. Dr. Davis was hired to teach parliamentary procedures, methods of conducting meetings, and interpersonal communications in work settings. At the time of trial he had left the University of Alabama to be the director of a similar new program in labor education at the University of Tennessee in Knoxville. His age and experience in teaching, along with his educational background, clearly made him more qualified than plaintiff Jamerson.
 
 
 13
 James W. Goode was 46 years of age at the time he was employed. He had attended but did not graduate from high school. He subsequently attended college at Wayne State University and Michigan State University acquiring approximately two years of college credit. Goode had extensive union background and connections, his father having been president of the local in Detroit where Goode was reared. From 1946 until 1972, a period of 26 years, Goode worked as a building trade apprentice and then as a pipefitter for Chrysler, Ford, and General Motors. While an automobile worker, he was a member of the large Local 600 of the UAW in Detroit where he held various union positions and offices and where he was chairman of the Education Committee. He had taught as an instructor at Michigan State University and at the Family Education Center operated by the United Auto Workers. His age, his work experience and union experience, as well as his teaching experience in the union movement made his qualifications significantly superior to those of plaintiff Jamerson.
 
 
 14
 Jamerson was employed one year after Davis and Goode at which time he was 35 years of age. He was a high school graduate and had attained approximately two years of college credits. He had worked ten years, four at Scott Valve and six at Kenner Metal, and at the former was recording secretary of the bargaining committee of the union and at the latter was shift steward and later chairman of the bargaining committee. In 1968 he was employed by Wayne State University as a labor program specialist where 80% of his time was occupied in administrative work and 20% in teaching.
 
 
 15
 Plaintiff offered no testimony whatsoever with respect to his claim that his abilities, training, and experience exceeded that of Davis and Goode. The foregoing summaries are taken from the applications of each of the three men when applying to the University. Jamerson made no pretense of submitting evidence with respect to his having done a superior job at Wayne State University or that either Davis or Goode had done anything less than superior work at their past positions, which was an opinion arrived at by Dr. Roberts after investigating Davis and Goode. Plaintiff Jamerson specifically requested Dr. Roberts not to contact his superiors at Wayne State University. Consequently, Jamerson was hired based purely on his application, his interview, and a recommendation from James Goode who had known Jamerson at Wayne State University and from whom Dr. Roberts had first secured Jamerson's name as a possible prospect for the 1973 position.
 
 
 16
 Plaintiff Jamerson's entire case was based upon his subjective feeling that he was not given equivalent rank and tenure with Davis and Goode simply because of his race, and he failed altogether to submit any evidence to show any racial bias on the part of Dr. Roberts. In fact, Dr. Roberts testified that he had discriminated against white males in the employment of Jamerson. As the fourth staff member of CLEAR, Dr. Roberts wanted a black or a female and only interviewed Jamerson and a woman. Dr. Roberts testified that he had a number of applications from white male applicants whose qualifications were superior to those of Jamerson.
 
 
 17
 The only witness testifying in behalf of the plaintiff was James Goode. In connection with Jamerson's nonretention, Goode had been the only staff member who had supported Jamerson's retention on the faculty at the University. On cross-examination Goode testified that he had only one conversation with Jamerson about the latter's grievances against the University. He stated to Jamerson, "Chuck, if there is some discrepancies here, it's not because of race." "And Chuck in return told me that no, I didn't understand institutional racism and he put it in such a way that I backed off. I didn't go into it any further." Thus, it is obvious that Mr. Goode, who had assisted Jamerson in obtaining the employment at the University, did not have any reason to think that Jamerson had been discriminated against because of race. The testimony reflected that Goode had been an active civil rights worker and belonged to NAACP and SCLC, the Urban League, and the American Civil Liberties Union.
 
 II.
 
 18
 Jamerson's contention that he was not retained on the University faculty because of race or because of retaliation as a result of his pursuing the initial grievance about hiring is as meritless as his claim concerning hiring. He offered no testimony with respect to either issue. The evidence established that fellow staff members Roberts, Davis, and Jordan found Jamerson extremely difficult to work with. Teaching in the CLEAR program was unlike that elsewhere in the University. The teaching was done usually in teams of two who would conduct a two or three day program or a series of evening programs to union members and they would alternate classes. For most of Jamerson's teaching assignment, he was paired with Goode because of the difficulties the other staff members had in working with Jamerson. Dr. Roberts stated that Jamerson did an adequate-to-good job but that he was in no way superior to any of the other staff members and in some respects not equal to them. He testified that Jamerson had not demonstrated any research ability, had developed no programs, and had written no articles. Dr. Roberts had offered Jamerson release time so that he could attend the University of Alabama at Tuscaloosa or any other university in the area so that Jamerson would have the opportunity to obtain his undergraduate college degree. Jamerson took no interest in this. Jamerson did not participate in University affairs, community affairs, or professional activities, all of which were considered important if a professor was to be retained at the University. Probably the most serious difficulty that Jamerson had was in his relationship with the other staff members. There were frequent staff meetings so that programs and teaching methods could be developed on a consensus basis, but according to other members of the staff, with the exception of Goode, Jamerson had to have his own ideas accepted or there was continual conflict. Faced with this significant testimony reflecting reasons for nonrenewal of the teaching contract, plaintiff Jamerson offered no evidence in rebuttal from any members of his classes whom he had taught, any member of the staff, except Goode, whose testimony has been mentioned, or any person or documents to support his claim that he was not retained because of race or retaliation. The University easily carried its burden in showing that Jamerson's nonretention was not based on race or retaliation, and Jamerson failed to meet the issue.
 
 
 19
 The appellant objects most strongly to the district court's failure to construe CLEAR's reappointment criteria and UAB's grievance procedure as indications of discrimination. He contends that procedural defects may imply UAB's subjective intent to discriminate. See Huang v. College of Holy Cross, 436 F.Supp. 639, 653 (D.Mass.1977); EEOC v. Tufts Institution of Learning, 421 F.Supp. 152 (D.Mass.1975). The reappointment criteria were allegedly discriminatory because they were formulated only two weeks prior to appellant's evaluation and were applied only to him. The appellee presented evidence, however, that the criteria and procedures differed little from those described in the Faculty Handbook of 1975. Dr. Roberts lobbied for certain changes which actually benefited the appellant. The required production of "scholarly research" by faculty members was modified for teachers in CLEAR to "materials development."
 
 
 20
 At oral argument counsel for plaintiff requested us to review carefully plaintiff's Exhibit 35 which would serve to convince us that plaintiff had been discriminated against. This exhibit reflects the August 17, 1976 report of the Faculty Affairs Grievance Committee which reviewed plaintiff's claim of discrimination in his nonretention on the faculty at the University. The four-member committee considered the procedure by which Jamerson was evaluated. Prior to Jamerson's evaluation to determine if he should be reappointed, the criteria had been the same as that used by the School of Business Administration which consisted of the generalities of "teaching, research, and service." The staff of CLEAR developed some specific criteria on May 28, 1975 which were modified on June 10. Professor Roberts' June 24, 1975 memorandum setting out the reasons for Jamerson's nonreappointment lists a mixture of factors from the two new sets of criteria. Two members of the committee believed that the evaluation procedure was fair. The two other members found that the use of new criteria to evaluate Jamerson had been unfair. These members focused on the procedure and did not reach the question of whether the decision not to retain was discriminatory.
 
 
 21
 Any change in criteria that made evaluations more specific had no relationship to the basic issues in this case. The fairness of utilizing new (arguably not new but merely more specific) criteria is not an issue. The exhibit does not establish a nonretention because of race. The totality of the evidence clearly supported a finding of a nondiscriminatory reason for nonretention, whichever criteria was used. Jamerson was not retained because his performance was unsatisfactory.
 
 III.
 
 22
 The district court refused to certify plaintiff Jamerson as class representative for others similarly situated at the University of Alabama. That decision is forcefully supported by the lower court's opinion and was justified based upon Jamerson's deposition filed in support of the request for certification. Jamerson was asked numerous questions about whether he knew any member of his race at the University of Alabama, Birmingham, who had not been granted tenure, who had been discriminated against in hiring, who had been discriminated against in nonretention, or who had in any way been discriminated against while on the faculty at the University. Jamerson was unable to tell of anyone who fell under that category. From the time suit was filed to the time of trial, Jamerson was not a resident of Alabama and was not in contact with any alleged class members who had been discriminated against. Upon his total failure to show any identification with or knowledge of other discriminatees who might make up a class, and upon failure to show that any members of the class had been discriminated against, the trial court was correct in not certifying Jamerson as a class representative.
 
 
 23
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452 October 14, 1980
 
 
 **
 Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation