**D. Dawn HOOKER, Plaintiff,**

v.

**TUFTS UNIVERSITY, et al., Defendants.**

**Civ. A. No. 78–2871–N.**

United States District Court, D.. Massachusetts.

Sept. 30, 1983.

Nancy Gertner, Silverglate, Gertner, Baker & Fine, Boston, Mass., for plaintiff.

Alan D. Rose, Danielle E. deBenedictis, Nutter, McClennen & Fish, Boston, Mass., for defendants.

## FINDINGS OF FACT AND RULINGS OF LAW

DAVID S. NELSON, District Judge.

### Introduction

This is an employment discrimination case, in which plaintiff D. Dawn Hooker alleges that she was wrongfully denied tenure by Tufts University in 1975, and was wrongfully denied appointment as Coordinator of Physical Education/Dance in 1976. Defendants are the Trustees of the University and three individual officials: then President, Burton C. Hallowell, once Provost, Albert D. Ullman, and then Dean, Bernard W. Harleston. The complaint in five counts charged two episodes of sex discrimination in violation of 42 U.S.C. § 2000e et seq., one claim for breach of contract, and two theories of misrepresentation. A jury verdict having been ren-dered for plaintiff on the pendant state claims, it is left to this Court to rule on the sex discrimination claims.

As this is a disparate treatment case under Title VII, and Ms. Hooker is the sole plaintiff, I am not asked to review the pattern, practice, or impact of any aspect of Tufts' employment policies in general. Rather, the central question in this case is the intent of the various university officials at the time they made a series of subjective judgments about Ms. Hooker's employment at Tufts. Employment practices at Tufts are relevant only insofar as they bear upon the states of mind of certain key officials and provide any inference as to their intent.

■ The structure for evaluating a Title VII disparate treatment claim is by now well established. First, the plaintiff must make out a *prima facie* case of discrimination. If she does so, the burden shifts to the defendants to articulate a legitimate, nondiscriminatory reason for their employment decisions. Finally, if the defendants articulate such a reason, the plaintiff must show that the proffered rationale was not the defendants' true reason, but instead was a pretext for illegal discrimination. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), *citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 804, 93 S.Ct. 1817, 1824, 1825, 36 L.Ed.2d 668 (1973); *Banerjee v. Board of Trustees of Smith College*, 648 F.2d 61, 63 (1st Cir.), *cert. denied*, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981). It is important to note, however, that despite these intermediate evidentiary burdens, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. I find that plaintiff has failed to meet this burden as to both Counts. Judgment must therefore enter for defendants on the sex discrimination claims.

*Preliminary Findings of Fact*

Tenure and Promotion Procedure at Tufts

1. Since 1970, Tufts has employed a formal tenure process for its faculty. Key to this process is a six-year probationary period, leading to tenure consideration in the sixth year in the form of peer review by a six-member, university-wide Tenure and Promotion Committee (T & P).

2. The criteria for tenure at Tufts are spelled out in the relevant Faculty Handbook as follows: "quality of mind, intellectual force, scholarship, teaching effectiveness and contributions to departmental objectives and those of the whole university." The Handbook goes on to state that "the minimum expectancy is that an individual will not be inferior in any ... [of the above]." *Exhs. 18 & 270.*

3. These criteria, commonly referred to as scholarship, teaching and collegiality, are the same three which have governed the Tufts tenure process for decades. Inauguration of the T & P heralded a more systemic, uniform application of these criteria by academic officers at Tufts. However, the standards for reviewing the criteria have steadily increased over this past decade as a result of ongoing efforts to maintain and improve the quality of the institution.

4. An individual faculty member must initiate the tenure review process by filing an application during his or her sixth probationary year if he or she seeks to continue at Tufts beyond the seventh year. Prior teaching experience at institutions other than Tufts can be credited toward the probationary period with the approval of the Dean of Faculty.

5. A formal departmental statement regarding the candidate's qualifications for tenure is then issued by the tenured members of the candidate's department.

6. Upon receipt of an application for tenure, the T & P appoints a subcommittee to investigate the applicant's qualifications and to make a recommendation to the T & P. The subcommittee is generally composed of two tenured faculty members from the applicant's department, two members of the T & P, and one "outside person" generally from another college or university.

7. If the subcommittee's vote is less than unanimous, a joint meeting is held between the subcommittee and the parent T & P. At the joint meeting, the members of the parent committee have the opportunity to question the subcommittee members concerning the candidate.

8. After the subcommittee makes its recommendation, the T & P meets to consider the candidate's tenure application. The T & P may have available to it materials which the subcommittee did not have, such as letters of recommendation received after the subcommittee's vote and "confidential letters" written by tenured members of the applicant's department.

9. Confidential letters must be written by the tenured members of the applicant's department and may be written by untenured members, under guidelines established by the T & P and distributed to candidates. The guidelines also provide that the confidential letters may be seen only by members of the T & P (and by the Dean, who is an *ex officio* member of the T & P).

10. After reviewing the candidate's qualifications, the tenure and promotion committee meets again to compare the candidates for that year and to vote. Generally, all candidates for tenure are compared and voted on at one meeting. The T & P then makes its recommendation to the Dean.

11. On receipt of the T & P's recommendation, the Dean reviews the candidate's qualifications and makes his recommendation to the Provost. Historically, the Dean has occasionally reversed positive recommendations of the T & P but has rarely, if ever, reversed negative recommendations.

12. On receipt of the Dean's recommendation the Provost reviews the candidate's qualifications and makes a recommendation

to the President. If the recommendation is positive, the President makes a presentation to the Board of Trustees. If the recommendation is negative, no action by the President is required.

13. As its name suggests, the T & P also evaluates tenured faculty members who are candidates for promotion to full professor. The Faculty Handbook indicates that the criteria for promotion are the same three implicated in tenure review: scholarship, teaching, and collegiality.

14. Obviously, however, the context for application of these criteria in a promotion decision differs from that in tenure. In one sense the decision is less critical. Tufts has already made a lifetime commitment to the faculty member by granting tenure, and must now decide only whether to extend the greater status and financial rewards of a full professorship. On the other hand, promotion review is cumulative—a candidate for promotion is expected to have performed the criteria above and beyond his or her tenure performance, in the sense of having matured professionally in the three areas measured by the committee.

15. At least two exceptional circumstances have arisen in the context of promotion at Tufts. The first is the so-called graveyard promotion, where an elderly faculty member is promoted at the end of a career. The other is a sort of grandfathering custom, by which certain faculty who obtained tenure before the onset of the T & P might be promoted by the committee on the basis of a slightly lesser standard of performance of the three criteria.

*History of the Physical Education Department*

16. In 1971 the physical education department at Tufts was structured in the traditional, albeit now outmoded, manner. Men's and women's physical education were segregated. Emphasis was placed on men's intercollegiate sports at the expense of intramural or instructional programs for both sexes. Dance was only beginning to emerge as a recognized activity.

17. Accordingly, physical education *per se* consisted of basic instructional courses in sports such as swimming and tennis. Both the men's and the women's instructional programs were of the "service" variety—high-volume courses were offered to the general university population in order that undergraduates might satisfy a physical education requirement. Most courses were not offered for academic credit. No physical education major was available.

18. In this last sense the Tufts program was and is distinct from an "academic" program in physical education, i.e. a program that trains students to be teachers and researchers in the field.

19. The physical education faculty as of 1971 reflected this traditional structure. Two full-time tenure-track female faculty taught instructional courses in the women's program and coached one or two women's teams. One other woman was employed as an instructor under a one-year contract. Seven tenured male faculty taught men's courses and coached. The men's and women's programs were separately chaired.

20. Beginning in 1970 and continuing throughout the period involved in this action, changes began to occur throughout the physical education department. The Tufts administration, stimulated no doubt by the dawn of Title IX, began to envision a modernization of the department. Specific initiatives included the hiring of plaintiff Dawn Hooker in 1971, the merging of the two instructional programs in 1973, the development of the dance program, the formulation of the All University Ad Hoc Committee on Athletics in 1974, and the revising of hiring policies and administrative structure within the department.

21. From 1971 to 1983, eleven faculty members were hired in physical education. Four were hired as dance instructors (one man and three women), and were placed on the tenure track. Seven other men were hired to be coach/lecturers off the tenure track.

22. During this same period, two candidates from physical education in addition to

Dawn Hooker came before the T & P: one woman was granted tenure in Dance, and one man, Rocco Carzo, achieved promotion.

*Plaintiff's Employment at Tufts*

*Previous to Tenure Year*

23. Plaintiff was first employed by Tufts as Assistant Professor and Acting Chairperson of the Women's Physical Education Department for the academic year 1971–72 at a salary of $9500. At the time of this appointment, she was about to receive a masters degree from the University of Washington, and had taught physical education for two years at Mount Holyoke College.

24. When plaintiff came to Tufts to interview for the job, she was told by Dean Harleston, as well as by members of the physical education department, that they were looking for a person whose primary responsibility would be to bring the physical education department up to date, by making changes in what was perceived to be an extremely stagnant program.

25. Also during a pre-employment interview, Ms. Hooker and Dean Harleston touched upon the subject of tenure. At that time, in April of 1971, Ms. Hooker stated that she was not particularly concerned with tenure, as she planned to remain at Tufts for only a few years.

26. Plaintiff's initial employment letter described her duties to be "teaching in the Physical Education Program and the development and coordination of the Women's Athletic program." Plaintiff was also asked to coach field hockey. *Exh. 5.*

27. Plaintiff was reappointed at Tufts for three consecutive years. In 1972 her title was changed from Acting Chair to Chair of the Women's Physical Education Department. In 1974 she was given responsibility for the men's instructional program as well, thereby becoming chair of the joint department.

28. Plaintiff received salary increases, as well as favorable evaluations from Dean Harleston in each of the four years.

29. As Chair, plaintiff provided initiative and leadership in attempting to bring the physical education department up to date as requested. She was partially if not solely responsible for the following specific accomplishments:

— shifting the emphasis in course instruction to so-called life-time activities.

— developing formal course outlines, student evaluations of faculty and interdisciplinary courses.

— clarifying and developing the dance program.

— stimulating the appointment of the All University Ad Hoc Committee.

30. While each of these initiatives was an accomplishment for Tufts, none was in fact unusual or particularly creative for the field of physical education as a whole. Similar changes had been or were being instituted at other schools.

31. Plaintiff did not engage in any scholarship while at Tufts. Her previous scholarship had been limited to her masters thesis.

*Tenure Year*

32. In the spring of 1974, Dean Harleston again discussed tenure with Ms. Hooker. They agreed that as a result of her two years' credit for prior teaching, Ms. Hooker would stand for tenure in 1974–75, her fourth academic year at Tufts.

33. Ms. Hooker applied for tenure in October of 1974. She received a positive recommendation from her department, then consisting of Professors Mary Frances Wright and Mary Sturtevant. *Exh. 27.*

34. A subcommittee was formed to review Ms. Hooker's application. The subcommittee consisted of Wright and Sturtevant from the department, Lucille Palubinskas and then Professor Albert Ullman (two members of the T & P), and Jean Rowlands, an outside expert from Northeastern University.

35. Because Ms. Hooker was chair of the department in 1974–75, Dean Harleston asked Rocco Carzo, acting director of Athletics, to perform the chair's function during the tenure review. This role consisted of assembling certain documentation for

the tenure review and ensuring that the T & P's procedural guidelines were followed.

36. All of the procedural guidelines for tenure review were satisfactorily followed in Ms. Hooker's case.

37. The subcommittee reviewed Ms. Hooker's tenure application, certain letters of recommendation from persons outside of Tufts, Ms. Hooker's teaching evaluations, and the departmental statement.

38. On the basis of the foregoing documents, the subcommittee voted four to zero in favor of tenure with one abstention. Professor Ullman abstained because he was disturbed by Ms. Hooker's lack of scholarship, and wanted a full discussion of the criteria for tenure in the physical education department. *Exh. 35.*

39. Professor Ullman's abstention resulted in a joint meeting between the subcommittee and the parent committee on February 24, 1975. The criteria for evaluating physical education faculty were discussed. Martin Sussman, a T & P member, asked Professor Sturtevant and Wright if Ms. Hooker should be judged by the same criteria as faculty in other departments. Wright and Sturtevant responded affirmatively.

40. In March of 1975, the T & P met to discuss and vote on Ms. Hooker's case. The T & P had at that time the following documentation available to it:

(a) The departmental statement. The department expressed support for Ms. Hooker. However, the statement also contained some reservations about Ms. Hooker's ability to communicate with department members and about her teaching ability. The departmental statement said nothing about scholarship and did not indicate that the curricular changes she had instituted should be considered a substitute therefor. The statement did not characterize Ms. Hooker as an outstanding or excellent teacher.

(b) The tenure application. In the section under "scholarship," Ms. Hooker stated that her duties as chair prevented her from engaging in research. She indicated an intention to engage in research in the future. In the section labeled "teaching," she listed the curricular changes which occurred in the department while she was chair.

(c) Outside letters. A number of outside letters were available to the T & P, some of which were received after the subcommittee vote. None of the letters equated Ms. Hooker's curricular work with scholarship. None of the letters described Ms. Hooker as an outstanding teacher. A few of the letters stated bluntly that Ms. Hooker did not meet the scholarship standard. Nevertheless, the vast majority of these letters were complimentary of Ms. Hooker and her potential. Only one was unqualifiedly negative.

(d) Confidential letters. Three members of the department wrote confidential letters to the T & P. These letters were seen only by the T & P and the Dean, in accordance with the T & P's guidelines. Mary Sturtevant's letter was positive. Mary Frances Wright also wrote a letter supporting Ms. Hooker but expressed reservations. Mr. Carzo wrote a letter which supported Ms. Hooker "as a professional" but expressed reservations about Ms. Hooker's personal style. Again, none of these letters suggested that Ms. Hooker's curricular changes should be considered a substitute for scholarship or that Ms. Hooker was an excellent or outstanding teacher.

(e) Teaching evaluations. These evaluations were mixed. They did not indicate that Ms. Hooker was either exceptionally good or exceptionally bad as a teacher.

(f) The subcommittee report. The subcommittee report described Ms. Hooker as an "above average," but not outstanding teacher. Ms. Hooker's lack of scholarship was noted, and the subcommittee indicated that Ms. Hooker's administrative duties may have made it more difficult to do research.

(g) The evidence of curricular changes submitted by Professor Wright.

41. On the basis of the foregoing documents the Tenure and Promotion Committee voted 6–0 to deny tenure to Ms. Hooker, and communicated its recommendation in writing to Dean Harleston on March 25, 1975.

42. In its report to the Dean, the T & P described the reasons for its recommendation. The T & P stated that if Ms. Hooker were to be judged by traditional scholarship standards, she would "clearly ... fail." The T & P acknowledged that the physical education department wanted it to consider the curricular changes to be research. The committee concluded that these changes were not sufficiently creative. Moreover, it noted that there was evidence of "interpersonal strain" within the department. *Exh. 40.*

43. After being informed of the recommendation of the T & P, plaintiff filed a request for reconsideration with the committee itself and with the Faculty Grievance Committee.

44. Professors Mary Sturtevant and Mary Frances Wright, both of whom had supported plaintiff's tenure application, urged reconsideration of plaintiff's tenure decision.

45. The T & P met again on May 23, 1975 and voted not to reconsider plaintiff's case. *Exh. 58.*

46. Dean Harleston reviewed the T & P's recommendation and the supporting materials. On July 10, 1975, he wrote to Provost Kathryn McCarthy, concurring in the T & P's recommendation. *Exh. 66.*

47. Provost McCarthy also made an independent evaluation of Ms. Hooker's qualifications, including contacting an outside official at the University of Pennsylvania and attempting to solicit his opinion of Ms. Hooker's dossier. Provost McCarthy concurred with the recommendation of the T & P.

48. On August 27, 1975, Ms. Hooker was advised that her appointment would not be renewed beyond the 1975–76 academic year. *Exh. 69.*

### Coordinator Position

49. In April 1976, after the denial of tenure and while in her terminal year, Ms. Hooker applied for a job advertised by the Tufts physical education department as Coordinator of Physical Education/Dance.

50. The job description for the coordinator position contained almost verbatim the duties Ms. Hooker had been performing as Chair and Associate Professor. However, this new position was not on the tenure track.

51. Plaintiff's application was returned without consideration by Rocco Carzo, then Director of Physical Education, Dance, Athletics and Recreational Intramurals (PEDARI).

52. Carzo declined to consider Ms. Hooker for the coordinator position at the direction of Dean Harleston.

53. Dean Harleston maintained that the following university policy precluded consideration of Ms. Hooker for the position: "Once a faculty member has had a tenure review or is in his/her terminal year, he or she will not be considered for any appointment at the University which involves full time or part time teaching." *Exh. 77.*

54. Defendants were unable to fill the position of Coordinator. Instead, Professor Mary Sturtevant, one of the two tenured members of the women's department, assumed the duties of coordinator in addition to her own teaching and coaching.

55. Plaintiff's employment at Tufts was terminated at the end of the 1975–76 academic year.

### Jurisdiction

56. On December 3, 1975, plaintiff filed a complaint with the Massachusetts Commission Against Discrimination (MCAD) alleging that defendants discriminated against her on the basis of sex by their failure to award her tenure and their refusal to consider her for the coordinator position.

57. On December 5, 1975 plaintiff filed a complaint with the Equal Employment Opportunity Commission (EEOC) charging that defendants discriminated against her

on the basis of sex in terminating her employment.

58. On May 27, 1977 the EEOC issued its determination, finding reasonable cause to believe that Tufts had discriminated against Dawn Hooker on the basis of her sex. *Exh. 235.*

### Count One

■ The formula for establishing a *prima facie* case in Title VII actions is also well established, having been delineated at the outset in *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. The Supreme Court simultaneously established that the formula could appropriately be modified to the facts of subsequent cases. *Id.* at 802, n. 13, 93 S.Ct. at 1824, n. 13. Accordingly, this Circuit has affirmed a standard for tenure cases by which I shall be guided:

1) that plaintiff belongs to a class protected by the statute;

2) that she was a candidate for tenure and was qualified under the institution's standards, practices or customs;

3) that despite her qualifications plaintiff was denied tenure; and

4) that tenure positions were open in plaintiff's department at the time she was denied tenure, in the sense that others in the department were granted tenure during a period relatively near to the time of plaintiff's denial.

*Banerjee v. Board of Trustees of Smith College,* 648 F.2d at 62.[1] Applying this standard to the action before me, I am compelled to rule that plaintiff has failed to establish a *prima facie* case on the tenure claim, and that judgment must enter for defendants on Count One.

■ It is first important to address the court's standard for reviewing plaintiff's qualifications for tenure. In this regard, I am clearly bound to accord the university decisionmakers certain deference. *Loeb v.*

*Textron, Inc.,* 600 F.2d 1003, 1012 n. 6 (1st Cir.1979); *Sweeney v. Board of Trustees of Keene State College,* 569 F.2d 169, 176 (1st Cir.1978) *vacated and remanded on other grds.,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Equal Employment Opportunity Commission v. Tufts Institution of Learning,* 421 F.Supp. 152, 158 (D.Mass. 1975). That is to say, it is neither appropriate nor necessary for me to make an independent academic evaluation of plaintiff. Rather, the court's task is to scrutinize defendants' evaluation in order to ascertain whether it was both procedurally fair and substantively reasonable. Within this range of reasonableness, and subject always to the mandate of Title VII, university officials have broad discretion in exercising their professional judgment as to students and fellow colleagues.[2] However, this discretion does not dictate an exaggerated deference to academic institutions in the Title VII context. This Circuit has firmly declined to accord universities a special deference such that discrimination principles are rarely enforced, *see Sweeney,* 569 F.2d at 176 and n. 14, *disclaiming Faro v. New York University,* 502 F.2d 1229, 1231–32, (2nd Cir.1974), and I am unwilling to do so. Thus although I limit my scope of review to assuring that evaluative decisions made by the defendants were reasonable, I simultaneously apply a strict Title VII scrutiny to ensure that those subjective decisions were not somehow infused with gender bias.

■ Plaintiff has not persuaded me that she was qualified for tenure pursuant to the standards and practices of Tufts as outlined in the Preliminary Findings above. I would grant that she was a successful and aggressive administrator, and that her performance was perhaps particularly impressive given her relative inexperience. Defendants themselves do not seek to deny the contribution Ms. Hooker made to the

---

1. I reject defendants' suggestion that Ms. Hooker must prove, as a *prima facie* matter, that the tenure review was procedurally defective.

2. *See Board of Curators v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978); *Beitzell v.*

*Jeffrey,* 643 F.2d 870 (1st Cir.1981); *Sweeney v. Board of Trustees of Keene State College,* 569 F.2d 169, 176 (1st Cir.1978), *vacated and remanded on other grds.,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

institution in this regard. Yet it is clear that as a tenure-track faculty member Ms. Hooker was required to excel not only in administrative service to the university, but in the areas of teaching and scholarship as well. *Finding 2.* I find the evidence of her performance in these latter two categories to be mixed at best.

The final report of the T & P to Dean Harleston which recommended denying tenure to Ms. Hooker described her as an "adequate" teacher. *Exh. 40.* This judgment is corroborated by other evidence in the record, including the teaching evaluations themselves, *exh. 180,* the departmental statement, *exh. 27,* and the subcommittee report. *Exh. 35.* There is no convincing evidence that either her teaching performance or her teaching potential was outstanding in any way.

Obviously, then, this case turns on the issue of scholarship, which was the third criterion outlined in the Faculty Handbook and employed by the T & P in the 1974–75 decision-making process. And, it is clear from the record that plaintiff never engaged in academic scholarship outside of her masters thesis. Plaintiff made no pretense about this. In fact, she acknowledged that the T & P's recommendation to the Dean was accurate in stating that were she to be judged by a standard of traditional scholarship, plaintiff would "clearly ... fail." The issue thus becomes whether plaintiff qualified for tenure based on some alternative standard. Two such possible standards were articulated at trial: 1) a "creative scholarship" standard and 2) a blanket waiver of scholarship for physical education faculty. I find that neither of these alternative theories establishes a *prima facie* case.

The record is clear that plaintiff did not qualify for tenure pursuant to the "creative scholarship" standard. First, the only evidence of such a standard actually being employed by Tufts was in the cases of two women artists who achieved tenure—the poet Denise Levertov in 1975, and

the dancer Alice Trexler in 1982. This suggests that the term "creative scholarship" connotes exactly what commonsense would indicate—the expression of artistic genius. Ms. Hooker made no claim to this sort of talent. Rather, she along with her two women colleagues offered to the T & P a set of course descriptions and departmental reports reflecting the curricular changes initiated by plaintiff and ultimately adopted by the University. I find that the T & P considered these offerings, and while it found them corroborative of plaintiff's *administrative* skill, it judged them insufficiently "creative" to meet the suggested alternative test for demonstrating scholarly talent. I find this judgment reasonable and well within the prerogative of this committee's role.

This brings me to the core of plaintiff's case. Ms. Hooker argues that she qualified for tenure by virtue of Tufts' alleged custom of effectively waiving the scholarship requirement for candidates from the physical education department. She points specifically to three men and one woman who received tenure in physical education in 1970 and 1971,[3] to the selection of Rocco Carzo to be Director of Physical Education/Dance, Athletics, and Recreation Intramurals (PEDARI) in 1974, and to the promotion of Carzo in 1982, as evidence of a custom of disregard for scholarship in evaluating physical education faculty. I will address these cases in reverse order.

Much example was made throughout the trial of Mr. Carzo as a Tufts employee similarly situated to plaintiff. After careful consideration of all the evidence I decline to so consider him. Rocco Carzo had been teaching and coaching at Tufts since 1966. He received tenure in 1970, at the dawn of the formal T & P process, and before the restructuring of the physical education department began. Moreover, by virtue of his position as football coach he had achieved a regional, if not national, reputation. Ms. Hooker, for all of her admirable spunk and potential, was a young

---

**3.** A fourth man, Woody Grimshaw, was promoted to full professor in 1970. For the reasons outlined in *Findings 14 and 15,* I do not find his case comparable to plaintiff's.

and relatively inexperienced administrator. Thus, apart from their respective qualifications for any particular position, Dawn Hooker and Rocco Carzo were not comparable faculty members.

This is particularly obvious in the context of the promotion decision: The Chairperson of the 1982 T & P, Linda Schaefer, testified quite forthrightly to the difficulty in applying the scholarship criteria for promotion to a football coach. I find the essence of her testimony to be that this committee adopted the approach suggested by defendant and former Dean Harleston, that is that Carzo's promotion be considered more administrative than academic, and that he be rewarded for his outstanding service to Tufts. *Exh. 24.*

The Court is quite well aware of the fact that no woman has ever been football coach at Tufts University and thus been in the position to reap the benefits of such an administrative promotion. However arguably unfortunate this reality may be, it does not establish or even suggest that by so rewarding Carzo, but declining to tenure a young faculty member on the same terms, defendants intended to discriminate against Ms. Hooker because she is a woman. To the contrary, several other, more plausible motives leap to mind.

First of all, the difference between the tenure and promotion contexts is relevant here. *Finding 14.* An institution's interest in recruiting and encouraging the highest quality and most compatible young faculty is clearly distinct from that of rewarding dedicated and experienced service. Particularly telling in this case is that the periods of 1966 to 1970—when Tufts confirmed its commitment to Rocco Carzo by awarding him tenure—and 1971 to 1975—when it refused to make that commitment to Dawn Hooker—were periods of stark contrast in physical education at Tufts. The record clearly discloses that 1971 marked a new administrative approach to

tenure in physical education. *Exhs. 73–75.* In short, the University had grown weary of awarding academic rank to athletic coaches. (see below). Rocco Carzo, along with two other men and one woman, squeezed into tenure rank prior to this administrative shift. Dawn Hooker, along with one male and one female dancer, did not. But clearly the fact that Hooker, a woman, became a victim of new tenure policy does not alone raise the spectre of sex discrimination.

Next, with regard to the PEDARI position, I find this employment decision incomparable in the final analysis to any tenure decision. As suggested in the Memorandum of Evidentiary Decisions, the PEDARI director was to be primarily an administrator. While this coordinator of other faculty would ideally be in a position to appreciate any teaching or research performed by his or her staff, scholarship requirements were conspicuously absent from the job description. *Exh. 234.* This is in direct contrast to the scholarship requirements I have already found to have been imposed on all Tufts tenure-track faculty. I therefore rule that choosing Rocco Carzo—a person without scholarship—to be PEDARI director does not establish that defendants waived the scholarship requirement for tenure in physical education.

This brings me to the fourth prong of plaintiff's *prima facie* case and to a more direct consideration of the 1970–71 tenure decisions. Although the tenuring of Rocco Carzo, Herbert Erickson, Joseph Lauletta and Mary Sturtevant would appear at first blush to be decisions relatively comparable to that regarding plaintiff Hooker, in fact Ms. Hooker was not at all similarly situated to her predecessors as a result of an administrative decision, albeit undisclosed to faculty,[4] to limit if not to cease altogether further tenuring in physical education.

---

**4.** It is unclear what the physical education faculty members knew or understood about this new policy. Clearly they did not have access to the internal memoranda produced in this case. On the other hand, they were witnesses to the hiring of only coach/lecturers in physical education after Dawn Hooker, and in fact Dean Harleston made at least one representation to the department as to the employment status of coach/lecturers.

Defendant Albert Ullman was Provost at Tufts from 1968 to 1973. In 1970 he approved the tenuring of two physical education instructors—Rocco Carzo and Mary Sturtevant. At that same time, a third physical education candidate, Neil Keller, was denied tenure. In a letter reporting these decisions to the then Chairperson of men's physical education, Harry Arlanson, Provost Ullman indicated the following:

> It was *not* a matter of tenure posts in the Department of Physical Education, although that is an issue that we will have to deal with. In the discussion of this matter of tenured posts, the trustees made it absolutely clear that they assumed those who were hired with the expectation of being on the tenure ladder would have the opportunity to be considered at the appropriate time and have their cases judged on its [sic] merits rather than on the table of organization. In the future we will be able to be realistic with new people that were [sic] hired and will have to inform them of the difficulties they are likely to encounter in achieving a tenured rank.

(emphasis in original) *Exh. 73.*

Provost Ullman went on to suggest that perhaps a "straight coaching position" could be ˙developed for the rejected Mr. Keller.

The following year, in 1971, Herbert Erickson was approved for tenure in physical education. Defendant and then Dean Harleston, in his recommendation to Provost Ullman, expressed "misgivings about making tenure appointments for positions involving coaching," and added, "I suspect that this will be the last tenured appointment to be made in the Department of Athletics for quite some time." *Exh. 74.* Provost Ullman subsequently wrote to President Hallowell regarding the Erickson promotion and stated: "I agree with Bernie that no new Physical Education people ought to be hired with the expectation that

they will be on the tenure ladder." *Exh. 75.*

The existence of this new policy, while arguably working to plaintiff's favor on the contract and misrepresentation claims, can only undercut a *prima facie* claim for sex discrimination. For this policy suggests that in fact no tenure positions were actually available in physical education at the time of plaintiff's candidacy. This analysis is furthered by the evidence that *no* physical education instructor (male or female) and only one dance instructor (female) has received tenure in the department since 1971. Again the fact that Dawn Hooker, a woman, was the first to fall victim to this new policy does not prove as a *prima facie* matter that Tufts intended to discriminate against her on the basis of her sex, any more than does the fact that three men and one woman from the old segregated departments achieved tenure before the onset of the new policy. Finally, nothing in the record of this case or inherent in the policy itself would suggest that it was created to foster sex discrimination against women. In fact the policy held the potential for quite the opposite effect. Since men's physical education had previously employed a much larger staff, more men would be (and in fact were) placed in the term-contract position of coach/lecturer with limited job security than were women.[5] I have considered all of plaintiff's theories to the contrary—particularly that of the "revolving door" theory of women's employment—and find them totally unsupported by the record. On these facts it is simply incredible that defendants Hallowell, Ullman and Harleston decided to limit tenure in physical education in order to prevent this plaintiff, or women in general, from remaining at Tufts.

In any event, the evidence suggesting that Tufts had previously waived the scholarship requirement for physical education faculty consists of these four decisions in

---

**5.** Plaintiff would have me believe that a coach/lecturer slot, with its regular contract review, is somehow more valuable to women faculty than a tenure-track position, as a result of the "up or out" policy which the latter entails. I am by no means persuaded by this argument.

1970–71 and the corroborating impressions of the All University Ad Hoc Committee on Athletics. *Exhs. 230 & 272.*[6] I find that the existence of prior waivers does not establish that as of 1974, Ms. Hooker was "qualified" for tenure.[7] Assuming that any acknowledged waiver policy existed, the University clearly retained the discretion to cease granting such waivers and to hold a physical education faculty member to the criteria posted in the Faculty Handbook.[8] While plaintiff might well challenge the fairness of this shift, or the truthfulness of the representations she received, neither of these issues implicates the sex discrimination count by rendering her "qualified" for tenure. Thus she fails to present a *prima facie* case on this theory.

*EEOC Determination*

■ Plaintiff urges that the Equal Employment Opportunity Commission's (EEOC) Determination suggests, if not compels, a finding that she has established a *prima facie* case. I disagree. Contrary to plaintiff's assertions, the administrative determination need not carry particular weight with this Court. For, "while EEOC findings in general may be significant evidence, their probative force in individual cases varies considerably and is left to the determination of the trial court." *Hilton v. Wyman-Gordon,* 624 F.2d 379, 383 (1st Cir.1981). As a result of my *de novo* review, I take issue with two of the agency's key conclusions as to pretext.

First, the agency adopts plaintiff's contention that she had no notice of the scholarship requirement's application to her. Yet my findings reflect that the *status quo* for Tufts tenure-track faculty was that the scholarship standard did apply. The University had no special duty to give notice of this requirement beyond its publication in the Faculty Handbook. Plaintiff's real claim is that she was not notified of the apparent policy shift, from granting informal waivers of this requirement to physical education candidates to holding these candidates to the same published standard. Under the circumstances, I find that although it clearly would have been fairer and considerably more professional had Tufts' administration taken more care in implementing the new policy, lack of such care does not implicate sex discrimination. The agency found this policy shift suspicious and, accordingly, labelled it pretext. However, as more clearly outlined below, I find that legitimate, gender-neutral university interests justified this policy shift and that it was not a pretext for sex discrimination.

Second, the agency was critical of what it perceived to be "confusion" within the T & P over the standard to be applied in plaintiff's case. What the agency failed to recognize is that the committee had broad discretion as to how and when to apply its standards. I find that the committee in fact performed whatever duty of fairness it may have owed plaintiff by carefully reviewing the terms of her employment and questioning both the department members and the administration as to the operative standard, and appropriately exercised its discretion not to apply the so-called waiver to this case.

648 F.2d at 63. Plaintiff cannot meet this minimal test in that her application was judged by the T & P to be the weakest of all twelve candidates for 1974–75.

---

**6.** I do not consider pre-1970 decisions, such as that for Mary Frances Wright, to be comparable. Although the criteria were ostensibly the same, these decisions occurred in a different era, before the onset of the T & P.

**7.** The First Circuit's decision in *Banerjee* does not dictate to the contrary. Plaintiff points to language employed by the district court and cited with approval by the appellate court to the effect that a plaintiff "need only show that his qualifications were at least sufficient to place him in the middle group of tenure candidates as to whom both a decision granting tenure and a decision denying tenure could be justified...."

**8.** *Banerjee v. Board of Trustees of Smith College,* 495 F.Supp. 1148, 1160 (D.Mass.1980). I decline to accept plaintiff's argument that the *Banerjee* analysis is inapposite because defendants here applied "a wholly new requirement to physical education." As my multiple findings and rulings attest, this is a mischaracterization of defendants' actions.

I am not unmindful of the agency's concern for subjective decision-making of this sort. Nor do I mean to suggest by these findings that invocation of discretionary processes shelters an employer from Title VII scrutiny.[9] The fact is that achieving tenure at a major academic institution is a highly selective and elitist process. Certain pedestrian concepts of fairness, for example that one should be rewarded for a job well done, are inapposite in this context. The institution has broad discretion to set very high standards and thus to decline to retain exceedingly talented people. Similarly, it has broad discretion to waive its own standards when the needs of the institution so dictate, so long as such decisions do not run afoul of the mandate of Title VII or other applicable law.

Finally, I am unpersuaded by the agency's analysis of alleged disparate treatment of males. As ruled above, Rocco Carzo was not similarly situated to plaintiff. The other two men who received tenure in 1970 and 1971, while perhaps more comparable, merely experienced the good fortune of being candidates before the implementation of new administrative policy. In truth, plaintiff does stand alone as the only physical education candidate for tenure since 1971.[10] This fact renders comparison more difficult. Yet I cannot infer that because this sole candidate was a woman, Tufts is liable for sex discrimination.

*Statistics*

■ Despite much controversy over the role and availability of affirmative action reports in this case, no such reports were ever produced as exhibits. Thus there is no evidence from this source as to Tufts' general employment practices. What has been submitted are the parties' independently constructed and conflicting charts as to the hire, tenure, and departure record for women and men faculty at Tufts during the period 1969–1982. Plaintiff concedes that statistics alone cannot establish a *prima facie* case. *McDonnell Douglas Corp.*, 411 U.S. at 805 n. 19, 93 S.Ct. at 1825 n. 19 (1973); *Tufts Institution of Learning*, 421 F.Supp. at 158. In fact she offered her charts (*Exhs. 279–297*) only to rebut defendants' proffer. However, I address both sides' statistical presentations here because I find that this rebuttal case is unpersuasive of a discriminatory climate at Tufts and thus cannot contribute to plaintiff's *prima facie* case.

Defendants' first chart purports to show that although up until 1979–80 only a very few women faculty were eligible for tenure each year, the percentage of female candidates actually receiving tenure was reasonable and relatively consistent with the percentage of male candidates. *Exh. 277.* Defendants' second chart merely suggests that these relative percentages remained constant when outside, lateral hiring by Tufts over the twelve year period is included. *Exh. 278.* Although it is equally obvious from this latter chart that Tufts was not successfully recruiting tenure-eligible women faculty at anywhere near the rate it was recruiting men, this fact contributes little to plaintiff's disparate treatment case.

Plaintiff has attempted to show in rebuttal that the candidate pool from which faculty members were chosen for tenure was distorted by previous discrimination. The point is well taken that during the applicable decade universities possessed an affirmative duty to recruit minorities and women, as well as to be cognizant of residual system-wide effects of past discrimination. But this duty cannot be confused with Title VII obligations to an individual faculty member.[11] Although plaintiff's re-

9. *Sweeney,* 569 F.2d at 176 n. 14; *see generally* Bartholet, *Application of Title VII to Jobs in High Places,* 95 Harv.L.Rev. 94 (1982).

10. Providing one accepts plaintiff's argument that the dance program should be considered separately. Three potential candidates existed in Dance during this period. One man and one woman were denied contract renewal before their probationary periods had run. One woman achieved tenure in Dance in 1982.

11. Title VII neither requires nor encompasses any form of affirmative action or preferential treatment. 42 U.S.C. § 2000e–2(j); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

buttal theory does cast a shadow on defendants' proffer, its probative effect ends there. I find that none of the statistics offered in this action influences the substantive rulings set out above. Notwithstanding the data battle, plaintiff has not made out a *prima facie* case.

### Defendants' Burden

■ I have ruled that plaintiff has not proven a *prima facie* case of sex discrimination on Count I. But even if I were able somehow to propel plaintiff past this threshold, she could not prevail. I simultaneously find, as suggested above, that defendants have met their *Burdine* burden of articulating legitimate, non-pretextual reasons for denying tenure to Ms. Hooker.[12]

There is no need to repeat in detail the evidence outlined above. The recommendation of the T & P to defendant Harleston carefully tracked the tenure criteria outlined in the Faculty Handbook. Those criteria are controlling. *Tufts Institution of Learning*, 421 F.Supp. at 158. Testimony from members of the committee revealed that Ms. Hooker was considered the weakest of the candidates that year, and in fact that other, potentially strong candidates (women and men) were also rejected. The only palpable question about this process, then, is the underlying reason for applying the scholarship standard to plaintiff. Ms. Hooker makes much of the fact that the standard has never been applied to a candidate from physical education before or since. However, at this level I also find that defendants have articulated a legitimate gender-neutral reason.

The exchange of three letters among the named defendants to this action—Hallowell, Ullman and Harleston—articulates that reason. I interpret these letters to mean that the Tufts administration had become uncomfortable with the routine tenuring of coaches. As a result, it arrived at two resolutions: 1) to conduct future physical education hiring primarily on the coach/lecturer basis off the tenure track, and 2) to be more strict with physical education faculty remaining on the tenure track. The justifications for this policy from the perspective of an academic institution are obvious. The only question remaining is why, in the face of this policy, Dawn Hooker was ever placed on the tenure track from the beginning.

Defendants have stated one reason for this which I find both credible and legitimate. As an administrator, the department chairperson was to supervise two other women faculty members who were already tenured. In addition, Tufts' administration was developing integration plans which would bring the men's and women's departments into more direct coordination. The chair of the men's department, as well as most of its faculty, was also tenured. Simply put, the administration felt that in order to initiate the changes expected of the women's chair, a candidate needed the power and authority of a tenure-track appointment. I find this articulation to be an eminently reasonable one. In fact, it seems clear that Tufts would have been far more vulnerable to accusations of sex discrimination had it denied this rank to the women's chair, thus handicapping her personal efforts and further diminishing the status of the women's department.

### Plaintiff's Rebuttal

■ As indicated above, it is plaintiff's responsibility to prove that the reasons proffered by defendants for the employment decision at issue were merely a pretext for sex discrimination. I rule that Ms. Hooker has failed to meet this burden. There is no evidence that defendants either intentionally contrived a no-tenure policy or granted Dawn Hooker tenure-track rank in the face of that policy in order to force her to leave Tufts because she is a woman. While plaintiff's statistics do suggest that a disproportionate number of women faculty leave the institution before achieving tenure, *Exhs. 288–89, 291–92,* the record contains nothing but speculation as to why this might be so. I find no evidence in this case of a general "revolving door" policy

---

12. As I find no pretext, I need not reach the so-called mixed motive or "but for" test.

on the part of defendants with regard to women faculty.

The only theory plaintiff offers for pretext in her individual case is that she was not adequately counseled at the outset as to the import of a tenure track appointment and the status of the scholarship criterion. I find on the basis of the entire record that this argument is disingenuous.

First of all, I find that defendant Harleston did discuss tenure with plaintiff at her pre-employment interview. *Finding 25.* It is undisputed that Ms. Hooker expressed indifference to matters of tenure at that time. Secondly, plaintiff was certainly on notice of the tenure criteria as published in the Faculty Handbook. To the extent that these criteria in fact conflicted with any custom plaintiff observed in the physical education department, it might well have been her responsibility to pursue this issue with Dean Harleston, not the reverse. The same is true for the alleged ambiguity as to the number of years to be credited toward plaintiff's probationary period. I find that Harleston discussed this issue with Ms. Hooker at least twice—at the initial interview in 1971 and again in the spring of 1974, when the two agreed that plaintiff would apply for tenure that fall.

In short, I find that Harleston made reasonable efforts to counsel plaintiff and that she, in the end, made her own decisions. Significantly, plaintiff has presented no evidence that male faculty were counseled any differently.[13] Early in her career at Tufts Ms. Hooker was not interested in tenure. Once she did become interested, she decided for herself that tenure would be "a piece of cake," and did not seek further counseling from the defendants. In retrospect this course of action was clearly improvident and perhaps impolitic on her part. It cannot however on this record be attributed to pretext on the part of defendants.

*Count Two*
*Prima Facie Case*

 In Count Two of her complaint, plaintiff asserts that Tufts again committed sex discrimination by refusing to rehire her in 1976 for the newly-created position of Coordinator of Physical Education/Dance. Because this is a straightforward hiring, as opposed to tenure, issue, the requirements of a *prima facie* case are somewhat more familiar and simple. Plaintiff must prove:

1) that she belongs to a class protected by the statute;

2) that she applied and was qualified for the position;

3) that despite her qualifications, she was rejected; and

4) that the position was filled with another.

*McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824. Applying this formula, I rule that plaintiff has made out a *prima facie* case of sex discrimination as to Count Two. In this instance defendants can hardly contest that Ms. Hooker was technically qualified for the position. The job description, as indicated in *Finding 50,* is a verbatim recital of the duties plaintiff had been performing as a faculty member, duties which the defendants acknowledged she had been performing well. Conspicuously absent from this new coordinator description is any scholarship requirement, and thus that key issue vanishes from the case for purposes of Count Two. Needless to say, the coordinator position was not advertised as tenure-track, and the record suggests that in fact it was purposely created to avoid that ranking. I therefore rule that plaintiff was qualified for the position of Coordinator of Physical Education/Dance.

Despite these qualifications, Dawn Hooker was rejected for the position well before the interview stage. In fact her application was returned to her by Rocco Carzo, on the

---

**13.** This distinguishes plaintiff's case from one of her most frequently cited authorities. *See Kunda v. Muhlenberg College,* 463 F.Supp. 294, 309

(E.D.Pa.1978), *aff'd.,* 621 F.2d 532 (3rd Cir. 1980).

advice of defendant Harleston. And although the University was unable to fill the position from the outside, the actual coordinator duties were eventually assumed by Mary Sturtevant, one of the tenured women in physical education, to be performed in addition to her other ongoing teaching and coaching responsibilities. I might note that plaintiff Hooker was at least as qualified for the position as was Mary Sturtevant if not more so; although the latter had spent more time at Tufts plaintiff possessed more administrative experience. However, plaintiff's success on Count Two ends here.

### Defendants' Burden

■ I rule that defendants' proffered reason for declining to consider Ms. Hooker for the coordinator position is legitimate and gender-neutral. Plaintiff, having been denied tenure, was in her terminal year at the University. She was well aware that Tufts' tenure system was based on the concept of "up or out," that is, if one can not be promoted to tenure one must leave the institution. Nevertheless, plaintiff endeavored to remain at Tufts by shifting to this coordinator position off the tenure track.

Defendant Harleston acknowledged that he was responsible for the rejection of plaintiff's coordinator application. According to his testimony, this decision was based on a personnel policy of his administration "that once a faculty member has had a tenure review and is in his/her terminal year, he or she will not be considered for any appointment at the University which involves full time or part time teaching." *Exh. 77.* He acknowledged that the only formal articulation of this policy was the cryptic memorandum of April 27, 1976 to Rocco Carzo, in specific response to Dawn Hooker's case. He also acknowledged that this approach to the issue became "University policy" by dint of his administration, but may not have been so enforced previously.

Most importantly however Harleston articulated a reasonable and gender-neutral explanation for the policy itself. Simply put, the University could not afford the risk of retaining "hybrid" teachers who had failed at tenure but continued to accrue years of service to the institution. One in such a position might well attempt to make an argument for *de facto* tenure, a situation which would throw the university personnel system into chaos.[14]

### Plaintiff's Rebuttal

In response to this reasoning, plaintiff has attempted to prove that despite such a legitimate interest, the University had in fact retained other, male teachers under these circumstances. Plaintiff points to the now infamous coach/lecturer category as a vehicle for exceedingly discretionary hiring. In short, plaintiff claims that Tufts' administration in its discretion has retained men as coach/lecturers while dismissing women who did achieve tenure, and that Dawn Hooker could and should have been offered a position off the tenure track—as either a coach/lecturer or a "coordinator"—if not originally in 1971, then certainly after she was denied tenure in 1976.

■ Plaintiff's argument is conceptually strong and deserves serious attention. Unfortunately for her, nothing in the record may truly be said to support this pretext theory. Perhaps the most damaging piece of evidence for defendants is that Provost Ullman apparently did consider accommodating in this manner a man, Neil Keller, who was denied tenure. *Exh. 73.* But two key facts negate the weight of this evidence. First, Keller was never actually appointed to a coach/lecturer slot. Second, the suggestion came from Ullman in 1971 just as defendant Harleston's tenure as Dean began. Thus the fact that other administrators at Tufts might at one time have considered this arrangement appropriate does not detract at all from Harleston's credibility as to his own policy or intent in 1976.

---

**14.** *See Banerjee,* 648 F.2d at 63, n. 3. This policy is implicit in the Faculty Handbook which provides for a terminal one-year contract after the denial of tenure.

The second factor damaging to Tufts is that the coach/lecturer slots were used almost exclusively to hire men for the men's department. During any year relevant to this litigation (1970–1983), the men's department roster included at least five and as many as twelve full-time equivalent coach/lecturers, and from two to seven tenured faculty members, whereas the women's roster never included more than three coach/lecturers and two tenured people. *Exh. 273.* It thus seems reasonable to suggest that the coach/lecturer vehicle may have contributed to the perpetuation of sex discrimination in physical education at Tufts. That is to say, more male coaches were hired to support the large number of men's teams, but the number of women's teams and/or coaches has seemingly not increased as one might have expected. Yet even this possibility is insufficient to support plaintiff's burden of proving pretext.

Manifestly, this is not a disparate impact case. Thus Tufts' policy or custom vis-a-vis coach/lecturers can only be accorded weight insofar as it bears upon the state of mind of the administrative decisionmakers with regard to Dawn Hooker and provides any inference as to intent. Even if I were to rule—which I do not—that the coach/lecturer system contributed to a discriminatory effect, this alone given the dearth of evidence above, does not persuade me that Harleston's proffered explanation is pretextual. Most obviously, there is no evidence in this record that an unsuccessful male tenure candidate was ever accommodated by a position off the tenure track during Harleston's administration. Absent this, there is no circumstantial evidence of discriminatory intent on his part. And since I find his testimony itself to be credible, I can only rule that defendants' articulated reason for refusing to consider Dawn Hooker for the position of Coordinator was legitimate and nonpretextual. Judgment must therefore enter for defendants on Count Two as well.

### Postscript

This was a serious and complex case. The evidence—ably, and at times, rather aggressively presented—required careful evaluation by the jury and this court. As my rulings on the defendant's various motions for directed verdicts indicate, the evidence was sufficient to establish that Dawn Hooker was entitled to damages from Tufts University on the state claims, and those verdicts, accordingly, must be sustained.

And, even as clear as it was to me that the allegations of discriminatory practice were not frivolous, I must find that they were just not proved. There is, in my view, no lack of congruity in these results.

Perhaps what was unraveled in the prosecution of this case, and what has been learned from the explications of many appellate opinions over the years that this case was in the making, may have made us all the wiser of the law's requirements for equitable dealings in employment practices and the need for careful avoidance of the insult of invidious discrimination: an end much to be desired.

### ORDER

Judgment for the defendants shall, in accordance with my finding and rulings, enter on the discrimination counts.

SO ORDERED.

### ORDER FOR JUDGMENT

Pursuant to the jury verdicts returned on May 11, 1983, and the Findings of Fact and Rulings of Law issued by the Court this day, judgments are HEREBY ENTERED in the above-entitled matter as follows:

On COUNT ONE, for sex discrimination:
JUDGMENT FOR DEFENDANTS

On COUNT TWO, for sex discrimination:
JUDGMENT FOR DEFENDANTS

On COUNT THREE, for breach of contract:
JUDGMENT FOR PLAINTIFF

On COUNTS FOUR and FIVE, for intentional and negligent misrepresentation:

JUDGMENTS FOR PLAINTIFF.
SO ORDERED.